**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JODI FITTIPALDI and LEXI FITTIPALDI, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

MONMOUTH UNIVERSITY,

Defendant.

Civil Action No. 20-05526 (MAS) (ZNQ)

**MEMORANDUM OPINION**

### SHIPP, District Judge

This matter comes before the Court upon Defendant Monmouth University's ("Monmouth" or "Defendant") Motion to Dismiss (ECF No. 24) lead Plaintiffs Jodi and Lexi Fittipaldi's (collectively "Plaintiffs") Amended Complaint (ECF No. 20). Plaintiffs opposed the motion (ECF No. 25), and Defendant replied (ECF No. 27). Both Parties filed several Notices of Supplemental Authority and replies with the Court. (ECF Nos. 26, 28–35.) The Court has carefully considered the Parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court grants in-part and denies in-part Defendant's Motion to Dismiss.

### I. BACKGROUND

#### A. Facts

This matter is a putative class action brought "on behalf of all people who paid tuition and fees for the Spring 2020 academic semester at Monmouth" University. (Am. Compl. ¶ 1, ECF No. 20.) Monmouth is a private university with an enrollment of approximately 6,300 students,

including both undergraduate and graduate students. (*Id.* ¶ 2.) The university is located in West Long Branch, New Jersey. (*Id.* ¶ 22.)

Plaintiff Lexi Fittipaldi is an undergraduate student attending Monmouth. (*Id.* ¶ 18.) She is majoring in Cybersecurity. (*Id.*) Plaintiff Jodi Fittipaldi is Lexi Fittipaldi's mother, and is a citizen of New Jersey. (*Id* ¶ 17.) Plaintiffs paid Monmouth approximately $19,796 in tuition for the Spring 2020 semester. (*Id.*)

Monmouth, on its website and through other literature, seeks to advertise the on-campus experience at the university. (*Id.* ¶¶ 28, 29, 31, 38.) In various promotional materials, it discusses the benefits of its location, campus, facilities, and in-person learning programs. (*Id.*) Monmouth also maintains various departmental policies and handbooks outlining differences between online and in-person classes and emphasizing the importance of attendance. (*Id.* ¶¶ 35–39.) Furthermore, Monmouth provides students an academic catalog. (*See id.* ¶¶ 38 n.15, 64, 78, 82.) This catalog contains a disclaimer that reads "[t]he information provided herein does not provide an irrevocable contract between Monmouth University and the student." (Ex. A to Mot. Dismiss, ECF No. 24-3.)

When choosing schools, Plaintiffs specifically sought "an on-campus experience [at Monmouth] for the variety of educational and extracurricular opportunities and benefits that only an in-person program can provide." (Am. Compl. ¶ 19.) Accordingly, sometime prior to the Spring 2020 semester, Plaintiffs accessed an online portal where Lexi Fittipaldi registered for classes which were to be conducted on-campus. (*Id.* ¶¶ 13, 20.) The registration portal provided specified rooms on-campus where classes were to be held. (*Id.* ¶ 13.)

On March 9, 2020, Monmouth, via correspondence from the University President, suspended all classes in response to the COVID-19 pandemic. (*Id.* ¶ 3.) On March 12, 2020, via correspondence from the University President, Monmouth transitioned all classes to remote online instruction until April 3, 2020. (*Id.* ¶ 4.) While the switch to online learning was at first temporary,

2

in light of the evolving pandemic, the school decided on March 24, 2020, to carry out the remainder of the spring semester online. (*Id.* ¶ 6.) Students could still largely take their usual classes and credits, but no in-person instruction was offered. (*See id.* ¶ 54.) After March 9, 2020, in addition to classes moving online, the campus and its facilities were closed to all students. (*Id.* ¶¶ 54-55, 61, 109.) Students paid for access to these amenities. (*Id.* ¶ 30.)

While prorated refunds were given for unused room contracts, meal plans, and parking fees, no such refund was given to students for tuition or other fees. (*Id.* ¶ 6 n.4 (referring to a March 24 letter from University President Dr. Leahy articulating what refunds would be given)); *see also id.* ¶ 17.)[1] The Plaintiffs, therefore, were not refunded any of the $19,796[2] they paid for the Spring 2020 semester. (*Id.* ¶ 17.)

## B. Parties' Positions

### 1. Plaintiffs' Position

Plaintiffs allege that Monmouth's failure to provide in-person instruction despite Plaintiffs' payment of full-tuition expenses constitutes a breach of contract, unjust enrichment, conversion, and money had and received. (*Id.* ¶¶ 75–126.)

In particular, Plaintiffs allege that through its "website and in its handbooks, policy manuals, brochures, . . . online course portal, advertisements, and other promotional materials[,]" Monmouth promised students that in exchange for tuition they would receive "in-person educational services, experiences, opportunities, and other related services." (*Id.* ¶¶ 78, 79.)

---

[1] A court may consider documents outside of the pleadings when deciding a motion to dismiss if the documents are "integral to or explicitly relied upon in the complaint." *McCauley v. Metro. Life Ins. Co.*, No. 18-7942, 2019 WL 145624, at *3 (D.N.J. Jan. 8, 2019) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).) Here, Plaintiffs' Amended Complaint provided links and relied upon statements and decisions made by the University President and published by Monmouth on its website. Thus, they may be considered at this stage.

[2] It is unclear how the tuition payments break down, and what portion of students' tuition is attributable to actual course credits as opposed to the use of facilities and other services that students did not have access to while classes remained online.

3

Furthermore, they allege that from those promises, Plaintiffs developed a "reasonable expectation" that Monmouth would provide on-campus classes and allow access to on-campus facilities. (*Id.* ¶ 82.) Plaintiffs allege, therefore, that Monmouth breached its contract with Plaintiffs by failing to provide in-person classes and access to facilities. (*See id.* ¶¶ 75–91.) This breach led to subsequent damage by way of tuition loss and lack of access to facilities bargained for. (*Id.* ¶¶ 75–101.)

On the same facts, as alternative theories of recovery, Plaintiffs seek damages resulting from unjust enrichment, conversion, and money had and received where Monmouth retained tuition monies for the Spring 2020 semester despite moving classes online and restricting access to campus. (*Id.* ¶¶ 102–26.)

### 2. Defendant's Position

In moving to dismiss, Defendant first argues that "Plaintiffs' causes of action for breach of contract, breach of implied contract, unjust enrichment, conversion, and money had and received must be dismissed because they constitute claims for 'educational malpractice,' which are not actionable under New Jersey law." (Def.'s Moving Br. 11, ECF No. 24-1.)

In the alternative, Defendant argues, Plaintiffs' breach of contract claims, express and implied, must be dismissed because: (1) Plaintiffs do not plausibly identify any contract promising in-person instruction; (2) "Plaintiffs do not identify any meeting of the minds" between the parties; (3) "New Jersey courts have repeatedly refused to recognize the existence of an implied contractual relationship" stemming from student catalogs, manuals, or handbooks; (4) the reservation of rights provision in Monmouth's academic catalog disposes of Plaintiffs' contract-based claims; and (5) "Monmouth's policy on tuition and fees recognizes that tuition is paid in exchange for a student's ability to earn credits toward graduation[,]" not attend school in-person. (*Id.* at 20–25.)

As to Plaintiffs' unjust enrichment claim, Defendant argues it fails for three reasons: (1) it is duplicative of the breach of contract claim; (2) "Plaintiffs do not adequately allege that

4

Monmouth unjustly retained the benefit of their tuition and fees"; and (3) there is no allegation that Monmouth used tuition fees for anything other than continuing its charitable mission during this pandemic. (*Id.* at 28–30.) Defendant argues that Plaintiffs' money had and received claim fails for the same reasons. (*Id.* at 33.)

Finally, Defendant argues Plaintiffs' conversion claim is similarly duplicative of their breach of contract claims and "do[es] not plausibly allege the essential element that Monmouth wrongfully exercised dominion and control over the tuition and fees . . . paid." (*Id.* at 31–32.)

## II. LEGAL STANDARD

Rule 8 (a)(2)[3] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state "the[ ] defendant[ ] unlawfully[ ] harmed[ ] me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw

---

[3] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented" upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

## III. DISCUSSION

Whether a plaintiff can bring a cause of action for breach of contract, unjust enrichment, conversion, or money had and received against a college or university after the institution transitioned to online learning in response to the COVID-19 pandemic is the subject of numerous cases.[4] After careful consideration of the parties' arguments, and based on the specific Amended Complaint in the present case, the Court grants in-part and denies in-part Defendant's Motion to Dismiss.

Under New Jersey law, "[t]o state a claim for breach of contract, [a plaintiff] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed [its] own contractual duties." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (citing *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002)). Traditionally, there are three types of contracts: express, implied-in-fact, and implied-in-law. *Wanaque Borough Sewerage Auth. v. Twp. of W.*

---

[4] *See, e.g., Doval v. Fairleigh Dickinson*, No. 4966-20 (N.J. Super. Feb. 5, 2021) (denying defendant Fairleigh Dickinson's motion to dismiss breach of contract and unjust enrichment claims against the university for its decision to move classes online in response to the COVID-19 pandemic); *Metzner v. Quinnipiac Univ.*, No. 20-784, 2021 WL 1146922, at *5–12 (D. Conn. Mar. 25, 2021) (granting in-part and denying in-part defendant's motion to dismiss while addressing educational malpractice, breach of contract, unjust enrichment, and conversion claims); *Shaffer v. George Wash. Univ.*, No. 20-1145, 2021 WL 1124607, at *1–3 (D.D.C. Mar. 24, 2021) (dismissing plaintiff's breach of contract, conversion, and unjust enrichment claims); *Hassan v. Fordham Univ.*, No. 20-3265, 2021 WL 293255, at *5–13 (S.D.N.Y. Jan. 28, 2021) (dismissing plaintiff's claims against the university for breach of implied contract, unjust enrichment, conversion, and money had and received claims); *Gociman v. Loyola Univ. of Chi.*, No. 20-3116, 2021 WL 243573, at *2–5 (N.D. Ill. Jan. 25, 2021) (dismissing breach of contract and unjust enrichment claims); *Lindner v. Occidental Coll.*, No. 20-8481, 2020 WL 7350212, at *7–10 (C.D. Cal. Dec. 11, 2020) (granting defendant's motion to dismiss where students brought claims of breach of contract, conversion, unjust enrichment, and money had and received).

*Milford*, 677 A.2d 747, 752 (N.J. 1996) (elaborating on these three types of contracts and observing that a "contract implied in law . . . is commonly referred to as a quasi-contract").

"The contract is express if the agreement is manifested by written or spoken words." *Id.* Relatedly, an "implied-in-fact" contract "is a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and promise have not been verbally expressed. The agreement is rather inferred from the conduct of the parties." *Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004) (quoting *In re Penn. Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987)). Finally, a contract implied in law, commonly referred to as a "quasi-contract," is not a true contract as it requires no mutual assent. *Beukas v. Bd. of Trs. of Fairleigh Dickinson Univ.*, 605 A.2d 776, 783–84 (N.J. Super. Ct. Law Div. 1991); *see also Wanaque*, 677 A.2d at 752 ("The authorities agree that a quasi-contract is not a contract at all, since there is no actual manifestation of assent."). Instead, a quasi-contract "arises because of considerations of equity and morality and is distinguished from an express contract or even one [implied-in-fact] which arises from mutual agreement and intent to promise." *Beukas*, 605 A.2d at 784.

New Jersey courts have not explicitly defined when a contractual relationship arises, and to what extent a contractual relationship exists between students and universities. *See Doe v. Princeton Univ.*, No. 20-4352, 2021 WL 194806, at *7 (D.N.J. Jan. 20, 2021) (articulating that "student[] tuition payments in exchange for education 'may in some circumstances be considered contractual consideration.'"). Rather, "New Jersey courts repeatedly refuse to apply strict contractual principles to conflicts between a university and its students." *Doe*, 2021 WL 194806, at *7 (citing *Napolitano v. Trs. of Princeton Univ.*, 453 A.2d 263, 272 (N.J. Super. Ct. App. Div. 1982)); *see also Moe v. Seton Hall Univ.*, No. 09-1424, 2010 WL 1609680, at *4 (D.N.J. Apr. 20, 2010) ("New Jersey courts have declined to characterize the relationship between student and university as [purely] contractual." (alteration in original)); *Mittra v. Univ. of Med. & Dentistry of*

*N.J.*, 719 A.2d 693, 697 (N.J. Super. Ct. App. Div. 1998) (rejecting "the rigid application of contractual principles to university-student conflicts."). Instead, "[t]he 'true' university-student 'contract' is one of mutual obligations implied, not in fact, but by law; it is a quasi-contract which is 'created by law, for reasons of justice without regard to expressions of assent by either words or acts.'" *Beukas*, 605 A.2d at 783–84 (citations omitted).

Before discussing Plaintiffs' claims under a quasi-contractual theory, however, this Court must first dispense with Defendant's argument that New Jersey's lack of recognition with respect to educational malpractice claims should bar Plaintiffs' claims sounding in breach of contract from consideration in their entirety. (*See* Def.'s Moving Br. 11.)

### A. Educational Malpractice

Defendant argues that Plaintiffs' breach of contract claims[5] are merely educational malpractice claims, and as such, they should be barred. This Court disagrees.

Defendant is correct that New Jersey does not recognize the doctrine of educational malpractice. *See Swidryk v. St. Michael's Med. Ctr.*, 493 A.2d 641, 643 (N.J. Super. Ct. Law Div. 1985) (finding there is no cause of action for educational malpractice in New Jersey). Educational malpractice claims, however, are tort claims. *See M.G. v. Crisfield*, No. 06-5099, 2009 WL 2920268, at *10 (D.N.J. Sept. 11, 2009) (referring to the "tort claim for educational malpractice"); *see also Myers v. Medford Lakes Bd. of Educ.*, 489 A.2d 1240, 1242 (N.J. Super. Ct. App. Div. 1985) ("Educational malpractice, like other professional or occupational malpractice, would [only] arise, if recognized as a cause of action, out of negligence principles."). Importantly then, the New

---

[5] For purposes of this Section, III(A), this Court will refer to all of Plaintiffs' breach of contract and quasi-contractual claims as "breach of contract claims." Importantly, however, while both claims sound in contract and thus are not barred by New Jersey's ban on educational malpractice claims, Plaintiffs' quasi-contractual claims are not "breach of contract" claims in the traditional sense. *Cf. Beukas*, 605 A.2d at 783–84 (citations omitted) (a quasi-contract is 'created by law, for reasons of justice without regard to expressions of assent by either words or acts.'"). This will be more fully elucidated later in this Memorandum Opinion.

8

Jersey ban on educational malpractice claims can only apply against Plaintiffs' breach of contract claims sounding in tort. *Crisfield*, 2009 WL 2920268, at *10 ("[W]hen considering breach of contract claims based on inadequate or ineffective educational services (rather than claims based on breach of an express contractual provision), New Jersey courts have noted that such claims are comparable to a tort claim for educational malpractice." (quoting *Stein-O'Brien v. Pennington Sch.*, No. 06-2101, 2008 WL 160588, at *6 (E.D. Pa. Jan. 15, 2008))).

All breach of contract claims against an institution of higher education, however, are not necessarily educational malpractice claims. As such, only claims advanced by Plaintiffs suggesting that Defendant breached a duty of care or that the quality of their education was affected by malpractice on the part of the school when it transitioned classes online should be barred. *Id.* (finding "to the extent [p]laintiffs premise their breach of contract claim on a general theory that [d]efendant failed to provide adequate or *effective* educational services to [plaintiff], the claim must be dismissed" (emphasis added) (quoting *O'Brien*, 2008 WL 160588, at *6)); *see also Winter v. Am. Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 223 (S.D.N.Y. 2017) ("Under New Jersey law, claims regarding the *sufficiency* of education, even if framed as a breach of implied contract, cannot be evaluated because they are barred by the educational malpractice doctrine." (emphasis added)). Any breach of contract claim that avoids such "quality" assertions, however, is capable of stating a claim upon which relief can be granted.

Although claims sounding in the tort of educational malpractice are barred because New Jersey does not recognize educational malpractice, Plaintiffs' Amended Complaint still contains allegations sounding in breach of contract, not tort. (*See, e.g.*, Am. Compl. ¶¶ 59 ("The move to . . . remote classes also deprived students of access to the facilities [and] materials . . . only offered on Monmouth's physical (as opposed to virtual) campus, including . . . studios [and] use of on-campus facilities."), 79 ("Plaintiffs and Defendant entered into a contractual relationship wherein

9

Plaintiffs would provide payment in the form of tuition and fees, and Defendant, in exchange, would provide in-person educational services, experiences, opportunities, and other related services."), 99 ("Defendant breached the implied contract . . . [when] Defendant moved all classes to online classes and restricted or eliminated Class and Subclass Members' ability to access university facilities.").) As such, New Jersey's prohibition on educational malpractice claims does not bar Plaintiffs' breach of contract claims in their entirety.

Ultimately, New Jersey case law should not be so widely construed as to hold that all breach of contract claims against colleges or universities fall within the purview of educational malpractice. For these reasons, the Court rejects Defendant's argument that New Jersey's bar on educational malpractice claims is grounds to dismiss all of Plaintiffs' breach of contract claims.[6]

### B. Breach of Contract

Under New Jersey law, to the extent that the student-university contractual relationship is defined in the context of administrative decision-making, it is one of quasi-contract. *See Beukas*, 605 A.2d at 783–84. This finding warrants further elaboration by the Court.

Significantly, both Parties focus their breach of contract arguments around case law arising out of student-university academic discipline or performance disputes.[7] This case law, following the Appellate Division's decision in *Napolitano v. Trustees of Princeton University*, is not persuasive in the context of Defendant's administrative decision to transition to online learning as

---

[6] Moreover, the Court finds it more appropriate to analyze the extent to which Plaintiffs' claims implicate educational malpractice on a more developed record.

[7] *Doe*, 2021 WL 194806, at *7 (discussing the student-university contractual relationship in the student discipline context); *Mucci v. Rutgers*, No. 08-4806, 2011 WL 831967, at *19 (D.N.J. Mar. 3, 2011) (discussing the student-university contractual relationship in the poor academic performance context); *Romeo v. Seton Hall Univ.*, 875 A.2d 1043, 1049–50 (N.J. Super. Ct. App. Div. 2005) (discussing the student-university contractual relationship in the academic discrimination context); *Mittra*, 719 A.2d at 696–97 (only considering "whether contract principles should be applied in resolving disputes involving student dismissals for academic reasons"); *Napolitano*, 453 A.2d at 272–73 (decided in the context of academic discipline, and finding, "[i]t is apparent that *some* elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the University").

10

a result of an exigent circumstance: COVID-19.[8] The Court, instead, finds *Beukas v. Board of Trustees of Fairleigh Dickinson* persuasive with respect to the Court's analysis as it expressly evaluates the student-university contractual relationship in the context of administrative decision-making. *See Mittra*, 719 A.2d at 697.

### 1. *Beukas v. Board of Fairleigh Dickinson*: Defining the Contractual Relationship between Student and University

In *Beukas*, Fairleigh Dickinson University ("FDU") maintained a private college of dental medicine. 605 A.2d at 777. FDU "published an annual Graduate Studies Bulletin detailing various graduate programs offered and an annual bulletin for the dental college." *Id.* The bulletin set forth the programs offered, curriculum, and terms upon which acceptance and admission into the college would be conditioned. *Id.* FDU's bulletin contained a reservation of rights provision. *Id.* at 777–78. One such right was the right to eliminate a college. *Id.* at 778. In 1989, FDU lost state aid. *Id.* The loss was so significant that FDU began contemplating shutting down the dental college. *Id.* at 778–79. Eventually, "[o]n June 14, 1989 [FDU] resolved that the dental college would be closed[.]" *Id.* at 779. The school took several measures, such as reaching transfer agreements with other dental schools, to try and lessen the burden on students caused by the administrative decision to shut down the school. *Id.* Plaintiffs, former students of FDU's dental school, sued FDU, alleging breach of contract. *Id.*

---

[8] *Compare Beukas*, 605 A.2d at 781 (addressing university administrative decision-making and distinguishing the case from *Napolitano*) *and Mittra*, 719 A.2d at 697 (articulating that *Napolitano* addressed "whether contract principles should be applied in resolving disputes involving student dismissals for academic reasons" while acknowledging that the *Beukas* Court assessed "whether a university could administratively terminate a college or program for financial reasons [and] the court took pains to distinguish that issue from questions pertaining to student dismissals for poor academic performance") *with Doe*, 2021 WL 194806, at *7 (citing *Napolitano* while defining student-university contractual relationship), *and Moe*, 2010 WL 1609680, at *4 (citing *Napolitano* while exploring the student-university contractual relationship), *and Romeo*, 875 A.2d at 1049 (citing *Napolitano* while defining the student-university relationship).

Specifically, the *Beukas* plaintiffs argued "that a contract exist[ed] between the university and its dental students as reflected in the annual bulletins issued by [FDU] and the dental college, as well as other publications of [FDU] which they assert[ed] [were] 'the controlling documents in their contractual relationship.'" *Id.* The plaintiffs argued that their first year's tuition payment completed a binding contract between them and FDU where the school bulletins defined their contractual relationship. *Id.* FDU argued in response that "the doctrine of judicial deference to university autonomy in academic decision[-]making as set forth in *Napolitano v. Princeton University Trustees* require[d] the court to decline to interfere with defendants' administrative decision to close the dental college." *Id.* at 779–80 (emphasis omitted) (citation omitted). In the alternative, FDU argued no contractual relationship existed between it and the plaintiffs, and if it did, that the reservation of rights clause was enforceable, and the plaintiffs could not recover. *Id.* at 780.

Ultimately, the *Beukas* Court found in favor of FDU. *Id.* at 785. In doing so, the Court took care to distinguish its decision from that reached in *Napolitano. See id.* at 780–82. The court recognized that "*Napolitano* was an academic fraud case" involving student discipline. *Id.* at 780. The court then found that "[a]lthough [the] Appellate Division in *Napolitano* appears to have accepted a modified standard of judicial deference for review of private university decision[-]making, [*Napolitano*] involved the exercise of *academic*, rather than *administrative* or business judgment, as in the instant case." *Id.* at 781. The Court concluded that neither "judicial deference [n]or even the *Napolitano de novo* type review is the appropriate standard for reaching a just determination in disputes of this nature." *Id.*

Important to note is the fact that the *Beukas* Court did not purport to define the contractual relationship between students and the university in the context of a school's decision to cancel classes in reaction to a pandemic. With that said, however, the Court made clear that outside of the

12

academic discipline standard, the *Napolitano* line of cases is not necessarily the proper standard. *See id.* at 782 ("[I]t is clear that *Napolitano*, a case involving academic fraud, did not expressly reject either the doctrine of judicial deference or the classic contract model as the theoretical framework for resolving university-student disputes *in every case*."). While acknowledging that rigid contract theory is discouraged in defining the student-university contractual relationship, the *Beukas* Court stated, "it would be naïve not to recognize that in the modern world[,] the university is indeed engaged in big business, with the student as consumer of its services." *Id.*

Ultimately, Defendant's decision to move classes online in this case does not comport squarely with the facts of *Napolitano* or *Beukas* because the decision to transition classes online in light of a pandemic involves neither academic discipline nor a business decision to permanently close a college. This Court finds, however, that the instant case is more akin to the administrative decision in *Beukas* than it is to the academic discipline decision in *Napolitano*. As "it is clear that *Napolitano*" and its progeny do "not expressly reject either the doctrine of judicial deference or the classic contract model as the theoretical framework for resolving university-student disputes *in every case*," this Court finds it proper for *Beukas* to define the contractual relationship between the parties in this case. *Id.* at 782.

Like in *Beukas*, where the sudden loss of funding necessitated an administrative decision of consequence to dental students' education, so too here did an exigent circumstance, the emergence of COVID-19, necessitate an administrative decision affecting students' ability to attend classes in-person. Additionally, in *Beukas*, the plaintiffs argued a contractual relationship existed between the student and university as through bulletins and other university representations. Similarly, Plaintiffs here argue a contract exists between the students and Monmouth as a result of representations made in "handbooks, policy manuals, brochures, . . . online course portal, advertisements, and other promotional materials[.]" (Am. Compl. ¶¶ 78–79.)

13

Finally, unlike *Napolitano* and its progeny, the case before this Court does not involve academic discipline, but rather administrative considerations as was the case in *Beukas*.

For these reasons, *Beukas* is the appropriate authority to define the student-university contractual relationship in this case. In defining that contractual relationship, the *Beukas* Court found that "[t]he 'true' university-student 'contract' is one of mutual obligations implied, not in fact, but by law; it is a quasi-contract which is 'created by law, for reasons of justice without regard to expressions of assent by either words or acts.'" *Beukas*, 605 A.2d at 783–84 (citation omitted). While the *Beukas* Court focused on the "*bona fides* of the decision[-]making and the fairness of its implementation," to rectify the dispute between student and university in the context of closing down a dental school, importantly, the Court's primary finding was that "applying quasi-contract theory to resolv[e] university-student conflicts over an administrative decision . . . is the most effective way to avoid injustice to both the university and its students." *Id.* at 784. Thus, quasi-contractual theory must be applied to the dispute in this case.

This finding, in turn, means Plaintiffs' traditional breach of contract claims, express and implied-in-law, fail to state a claim upon which relief can be granted. As instructed by *Beukas*, classic contract doctrine should not be used to resolve disputes of this nature where the alleged terms of the contract are contained in various representations by the university and there is no express mutual assent. *Beukas*, 605 A.2d at 783–84. This principle holds true even under *Napolitano* and its progeny which seek to define the student-university relationship in the academic discipline context. *Doe*, 2021 WL 194806, at *7 (citing *Napolitano*, 453 A.2d at 272); *Moe*, No. 09-1424, 2010 WL 1609680, at *4 ("New Jersey courts have declined to characterize the relationship between student and university as [purely] contractual." (alteration in original)); *Mittra*, 719 A.2d at 697 (rejecting "the rigid application of contractual principles to university-student conflicts"). As such, as a matter of law, Plaintiffs' traditional breach of contract claims

14

must be dismissed with this Court's finding that if a contract exists at all in this case, it is quasi-contractual.

## 2. Application of Quasi-Contract Theory

The *Beukas* Court applied a "good faith and fair dealing" standard to resolve the dispute before it. *Beukas*, 605 A.2d at 784–85. The *Beukas* Court indicated, "[t]he inquiry should be: did the university act in good faith and, if so, did it deal fairly with its students?" *Id.* at 784. In reaching its decision, the *Beukas* Court noted:

> In this case, plaintiffs and defendants have stipulated that in deciding to close the dental college, defendants did not act arbitrarily, negligently or in bad faith. Plaintiffs appear to acknowledge that defendants could not continue the dental college without state funding. Nor is there any dispute that defendants acted other than in good faith both in giving adequate notice of their intentions to close the college and in arranging transfer and admission of plaintiffs to other dental schools in the area to avoid any disruption in their education. Under these facts and circumstances, it cannot be said that defendants breached any obligations to plaintiffs. Any loss or detriment suffered by plaintiffs cannot be said to have been unjustly caused by defendants. Injustice is always a fundamental aspect of quasi-contract recovery . . . the essence of which is unjust detriment.

*Id.* (internal quotation marks and citation omitted). The *Beukas* Court summarized the relevant standard as follows: "The judicial inquiry should be directed toward the *bona fides* of the decision making and the fairness of its implementation: whether the institution acted in good faith and dealt fairly with its student body should be the polestar of the judicial inquiry." *Id.* at 784.

In *Dougherty v. Drew University*, the Honorable Kevin McNulty, U.S.D.J., examined claims with respect to Drew University's ("Drew") transition to online instruction in response to the COVID-19 pandemic. No. 21-249, 2021 WL 1422935 (D.N.J. Apr. 14, 2021). Judge McNulty found that the *Beukas* standard should apply to a similar set of factual allegations. *Id.* at *4-6. Under *Beukas*'s quasi-contract analysis, Judge McNulty turned to whether the *Dougherty* plaintiffs plausibly alleged that Drew's decision was arbitrary or in bad faith and held that they did not. *Id.* at *6-7. In reaching his decision, however, Judge McNulty recognized "that the COVID-19

15

situation is unprecedented and the standard open to reasonable debate." *Id.* at *7. Judge McNulty, therefore, analyzed the reservation of rights provision in Drew's Academic Catalog as an alternative basis for dismissal, and found that the provision permitted Drew's actions. *Id.* at *7–8.

Because the quasi-contract analysis sounds in equity, it provides flexibility. Here, the Court aligns with Judge McNulty's adoption of the *Beukas* quasi-contract standard. The Court, however, reaches a different outcome than Judge McNulty. Construing the Amended Complaint in the present matter in the light most favorable to Plaintiffs, Plaintiffs (at a minimum) allege that Monmouth acted arbitrarily and other than in good faith by failing to reduce the cost per credit due to the remote instruction. For example, the Amended Complaint specifically alleges:

> Indeed, Monmouth itself recognizes that remote learning options are not the equivalent to an in-person experience. Summer courses at Monmouth were offered remotely, and Monmouth reduced the cost per credit due to the remote instruction by 15%. While Plaintiffs contend the true value of the online-only education provided by Defendant is worth substantially less than a mere 15% discount, the fact the Defendant reduced the price of online-only summer session courses demonstrates Defendant's own belief that the online-only courses are worth less than in-person outcomes.

(Am. Compl. ¶ 39.)

Applying *Beukas*'s equitable analysis to the facts alleged in Plaintiffs' Amended Complaint, the Court finds that Plaintiffs set forth a plausible claim for relief under a quasi-contract theory.[9]

For the reasons set forth above, the Court denies Defendant's motion to dismiss Plaintiffs' breach of contract claim under the quasi-contract theory articulated in *Beukas*. Here, the Court finds it appropriate to consider the bona fides of Monmouth's decision making and the fairness of its COVID-19 remote learning implementation upon a full factual record.[10]

---

[9] The Court notes that Monmouth's reservation of rights provision differs from Drew's. Monmouth's provision states, "Monmouth University has provided the following information to the public. The information provided herein does not provide an irrevocable contract between Monmouth University and the student. The University reserves the right to alter any policy, procedure., curricular information, facts, and/or fees without any prior notice or liability." (ECF No. 24-3 at *8.) Drew's provision states:

> The University reserves the right in its sole judgment to make changes of any nature in the University's academic program, courses, schedule, or calendar whenever in its sole judgment it is deemed desirable to do so. The foregoing changes may include, without limitation, the elimination of colleges, schools, institutes, programs, departments, or courses, the modification of the content of any of the foregoing, the rescheduling of classes, with or without extending the enhanced academic term, the cancellation of scheduled classes, or other academic activities. If such changes are deemed desirable, the University may require or afford alternatives for scheduled classes or other academic activities. If such changes are deemed desirable, the University may require or afford alternatives for scheduled classes or other academic notification of any such change as is reasonably practical under the circumstances.

(21-249 (KM), ECF No. 6, Ex. H.) Drew's provision is substantially more comprehensive than Monmouth's provision. Here, the Court is not inclined to analyze Monmouth's provision on a motion to dismiss.

[10] The *Dougherty* Court distinguished between tuition claims and fee claims. With respect to the fee claims, the Court stated, "*Beukas*-style claims . . . go to the core of the university's pedagogical mission. Such concerns are absent in the case of fee-based claims. . . . The judiciary is well-equipped to decide these standard-fare contract claims regarding fees." 2021 WL 1422935, at *11. The *Dougherty* complaint set forth several specific fees, including: (1) $75.00 "Art Fee"; (2) $200.00 "Parking Fee"; and $125 "Technology Fee." (Compl. ¶ 14, No. 21-249, ECF No. 1-2.) The Amended Complaint in the present matter reflects that students paid various fees, including a "Comprehensive Fee." (*See, e.g.*, Am. Compl. ¶ 42.) Based on the allegations in the Amended Complaint, however, it is not clear which fees would be subject to and/or amenable to a standard contract analysis. Based on the Amended Complaint in the present matter, the Court declines to distinguish between Plaintiffs' tuition claims and fee claims. To the extent Plaintiffs assert that specific fees are subject to and amenable to a standard contract analysis, Plaintiffs may file a motion for leave to amend to include a standard breach of contract claim for those specific fees.

17

### C. Unjust Enrichment[11]

In New Jersey, to state a claim for unjust enrichment Plaintiffs must adequately allege "(1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." *N.Y. Pipeline Mech. Contractors, LLC v. Sabema Plumbing & Heating Co.*, No. 10-148, 2012 WL 209349, at *2 (D.N.J. Jan. 24, 2012) (citing *Wanaque*, 144 N.J. at 574).

Here, Plaintiffs sufficiently plead a claim for unjust enrichment. Plaintiffs allege that Defendant received a benefit from Plaintiffs when it received full tuition from them for the Spring 2020 semester. (Am. Compl. ¶¶ 8, 17.) Plaintiffs allege that this tuition payment, in part, paid for access to facilities and the use of other amenities on campus. (*See id.* ¶ 30.) As such, Plaintiffs successfully plead that Defendant received a benefit from Plaintiffs.

Plaintiffs then allege that Defendant retained the full extent of this benefit despite classes moving online in March, campus closing, and access to university facilities being limited. (*Id.* ¶¶ 17, 30, 55.) If Plaintiffs' allegations are true, Defendant could have plausibly experienced a windfall where it collected full tuition in exchange for services or amenities that it did not provide Plaintiffs after classes moved online. This windfall, as alleged, may be inequitable as it may qualify as Defendant unjustly enriching itself with student tuition monies where it did not fully provide the services presumedly promised tuition-paying students. *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992) ("*Quasi*-contractual liability 'rests on the equitable principle that a

---

[11] There is significant overlap between the quasi-contract claim under the *Beukas* standard and the unjust enrichment claim. In addition, both unjust enrichment and money had and received are "quasi-contractual or restitutionary in nature." *N.Y. Pipeline Mech. Contractors, LLC v. Sabema Plumbing & Heating Co.*, No. 10-148, 2012 WL 209349, at *2 (D.N.J. Jan. 24, 2012). Additionally, "'unjust enrichment' and 'money had and received' are in essence the same claim." *Id.* at *2, *2 n.2 ("One cause of action for unjust enrichment at common law was the action in assumpsit for 'money had and received[.]'"). As such, this Court will refer to both claims as "unjust enrichment."

18

person shall not be allowed to enrich himself unjustly at the expense of another.'" (citation omitted)).

Ultimately, as the *Beukas* Court explained, "it would be naïve not to recognize that in the modern world[,] the university is indeed engaged in big business[.]" *Beukas*, 605 A.2d at 782. Here, Plaintiffs adequately allege the students in this case did not enjoy the full benefit of the services they paid for. As such, this Court will not dismiss Plaintiffs' unjust enrichment claim.

### D. Conversion

In *Dougherty*, the Court found that the *Beukas* standard should apply to the conversion claim. *Dougherty*, 2021 WL 1422935, at *9 (D.N.J. Apr. 4, 2021). The *Dougherty* Court also declined "to expand conversion to encompass claims that a particular kind of instruction is 'property.'" *Id.* This Court similarly declines to expand the definition. To the extent Plaintiffs allege that conversion encompasses claims for a particular kind of instruction, the Court adopts *Dougherty*'s reasoning. With respect to Plaintiffs' allegations regarding their "funds" as property, "the law draws a line . . . between a claim that one is owed money, and a claim that a particular pot of money was taken or wrongfully diverted to the defendant's own use." *Id.* As such, the claim "must be distinguished from a debt." *Id.* Similar to Plaintiffs' quasi-contract claim under the *Beukas* standard, the Court finds it appropriate to consider the conversion claim on a full factual record.

## IV. CONCLUSION

For the reasons set forth above, the Court grants Defendant's motion to dismiss Plaintiffs' traditional breach of contract claims but allows a quasi-contract claim under the *Beukas* standard

to proceed. The Court denies Defendant's motion with respect to the remaining claims. The Court will enter an Order consistent with this Memorandum Opinion.

s/ Michael A. Shipp<br>
**MICHAEL A. SHIPP**<br>
**UNITED STATES DISTRICT JUDGE**