**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JODI FITTIPALDI and LEXI FITTIPALDI, on behalf of themselves and others similarly situated, | |
| Plaintiffs, | Civil Action No. 20-5526 (MAS) (DEA) |
| v. | **MEMORANDUM OPINION** |
| MONMOUTH UNIVERSITY, | |
| Defendant. | |

**SHIPP, District Judge**

This matter comes before the Court on Defendant Monmouth University's ("Monmouth") Motion for Reconsideration of this Court's June 1, 2021 Memorandum Opinion and Order (the "Opinion"). (ECF No. 39.) Plaintiffs Jodi and Lexi Fittipaldi ("Plaintiffs") opposed (ECF No. 41), and Monmouth did not reply. The Court has carefully considered the parties' submissions and decides the motion without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants in-part and denies in-part Monmouth's Motion.

**I.    BACKGROUND**

The Court adopts the factual background set forth in its Opinion and adds detail to that background here. As in its Opinion, the Court accepts as true all factual allegations in Plaintiff's

First Amended Complaint. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2018) (citing *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).[1]

### A. Factual Background

Like so many others over the past two years, this backstory finds its roots in the novel coronavirus. A serious threat to public health, the World Health Organization declared the coronavirus a public health emergency in late January 2020. (First Am. Compl. ("FAC") ¶ 48, ECF No. 20.) In response to that declaration and the spread of the coronavirus in New Jersey, Governor Murphy declared a state of emergency and enacted a series of executive orders. Most salient here, on March 16, 2020, Governor Murphy issued Executive Order 104, which mandated that "[a]ll institutions of higher education shall cease in-person instruction beginning on Wednesday, March 18, 2020, and shall cease such in-person instruction as long as this Order remains in effect." N.J. Exec. Order 104, at 5 (Mar. 16, 2020). Governor Murphy reiterated that mandate in another executive order issued five days later. *See* N.J. Exec. Order 107, at 10 (Mar. 21, 2020). Alongside other universities across New Jersey, Defendant Monmouth complied with these executive orders, cancelling all in-person classes and shutting its doors on March 9, 2020. (FAC ¶¶ 3-7.)

This lawsuit followed. Plaintiff Lexi Fittipaldi is enrolled at Monmouth and is majoring in Cybersecurity, which "relies extensively on in-person instruction, meaningful student presentations, peer collaboration, and access to university facilities." (*Id.* ¶ 18.) She alleges that she chose to enroll in Monmouth's Cybersecurity program because of the "on-campus experience," including "the variety of educational and extracurricular opportunities." (*Id.* ¶ 19.) Plaintiff Jodi

---

[1] Although Plaintiffs have filed a Second Amended Complaint, the Court draws the following facts from the First Amended Complaint, which was operative when the Court issued its Opinion.

2

Fittipaldi is Lexi's mother and helped pay for her daughter's education. (*Id.* ¶ 17.) Specifically, Lexi enrolled in 18 credits at Monmouth in the spring 2020 semester for $19,796; Jodi paid roughly $12,500 out-of-pocket, and Lexi financed the rest. (*Id.* ¶¶ 17-18.) Regarding the courses Lexi chose for the spring semester and the consequent tuition payments, Plaintiffs' First Amended Complaint alleges that "Plaintiffs would not have paid as much, if any, tuition and fees for the Spring 2020 semester at Monmouth had they known that the courses would not, in fact, be taught in-person." (*Id.* ¶ 20.)

To that end, several allegations buttress the significance of in-person education to both Plaintiffs and Monmouth. For example, the First Amended Complaint cites to two webpages from the Monmouth University website, which were "the primary means through which [Monmouth] target[ed] prospective students." (*Id.* ¶¶ 29, 31, 35.) A sampling of the first webpage, entitled "Why Monmouth, Why Now," highlights the benefits of an in-person experience at Monmouth:

- From athletics to clubs, fraternity and sorority life, to social gatherings and multicultural activities, Monmouth University has staked a place among the top private universities.

- With new academic buildings and residence halls, Monmouth provides new students with a rewarding and meaningful college experience.

- Come visit our 170-acre campus, and you'll quickly feel our warm, friendly atmosphere and experience our historic architecture mingled among new academic buildings and residence halls.

- Given Monmouth's coastal location and its proximity to cities like New York and Philadelphia, students enjoy easy access to many cultural and recreational opportunities.

(*Id.* ¶ 29.) The second, called "Location is Everything," is more to-the-point, noting that Monmouth has a "location that directly impacts and enhances learning experiences every day." (*Id.* ¶ 31.) As part of the enhanced learning experience, Monmouth touted the "clear ocean waters

3

at the beach through the Urban Coast Institute," "[g]roup excursions" and "internship opportunities" in New York City and Philadelphia, and "Monmouth's 168-acre campus full of wide green lawns and historic yet state-of-the-art facilities." (*Id.*) Indeed, Monmouth advertised that its "location can lead you to opportunities anywhere in the world." (*Id.*)

Echoing those advertisements, Monmouth recognized the premium it placed on an in-person experience. For example, Plaintiffs' First Amended Complaint alleges that, before the pandemic, Monmouth did not offer online undergraduate degrees and offered limited undergraduate and graduate virtual coursework. (*Id.* ¶¶ 36, 58.) According to the First Amended Complaint, "[b]y offering such limited course and programs online, [Monmouth] acknowledged that virtual education is a unique format and, moreover, that [it] was not prepared to deliver the breadth of programs and degrees it offers on-campus in a virtual format." (*Id.* ¶ 58.) As another example, the First Amended Complaint alleges that Monmouth's pre-pandemic attendance policy stressed the significance of in-person learning by requiring students to physically attend and participate in classroom courses. (*Id.* ¶ 38.) As a final example, Plaintiffs' First Amended Complaint alleges that, during the pandemic, in the summer 2020 semester, Monmouth reduced the cost for virtual courses by 15% vis-à-vis in-person courses—thereby "demonstrat[ing] [Monmouth's] own belief that the online-only courses are worth less than in-person courses." (*Id.* ¶ 39.)

Advertising and in-person premium notwithstanding, Monmouth was unable to offer in-person classes for part of the spring 2020 semester due to Governor Murphy's executive orders. (*See id.* ¶ 54.) Although the State forced Monmouth to switch to virtual courses, Monmouth continued to charge the in-person tuition and fees for the spring 2020 semester. (*Id.* ¶ 41.) According to Plaintiffs' First Amended Complaint, however, Monmouth's decision to charge the

4

same tuition and fees ignored that Plaintiffs never received the benefits of the in-person premium. (*Id.* ¶¶ 55-59.) Specifically, Plaintiffs' First Amended Complaint alleges that Plaintiffs never received the benefits of "in-person learning from . . . peers and school faculty," "use of on-campus facilities," "laboratory and research experience," and "attendance at on-campus events." (*Id.* ¶ 59; *see also id.* ¶ 55 ("[Monmouth] has not delivered the educational services, facilities, access and/or opportunities that Plaintiff[s] and the putative class contracted and paid for.").) As a result of these deprivations, Plaintiffs' First Amended Complaint requests "a refund of tuition and fees for services, facilities, access and/or opportunities that [Monmouth] has not provided." (*Id.* ¶ 55.)

### B.    The Court's June 1, 2021 Opinion

Plaintiffs' First Amended Complaint proceeded primarily under a breach-of-contract theory, whereby Monmouth breached an express or implied contract with Plaintiffs by failing to offer in-person education. *See Fittipaldi v. Monmouth Univ.*, No. 20-5526, 2021 WL 2210740, at *2 (D.N.J. June 1, 2021), ECF No. 37. Plaintiffs alternatively alleged claims for unjust enrichment, conversion, and money had and received. *Id.* In response, Monmouth moved to dismiss Plaintiffs' First Amended Complaint, arguing, among other reasons, that Plaintiffs had alleged no express contract between the parties and that New Jersey law did not recognize implied contracts between universities and students. *See id.* Further, Monmouth argued that the Court should dismiss Plaintiffs' remaining claims as duplicative or derivative of Plaintiffs' breach-of-contract claim. *See id.* at *3.

The Court resolved Monmouth's motion to dismiss in its Opinion. There, as relevant here, the Court agreed with Monmouth that Plaintiffs could not proceed under an express or implied breach-of-contract theory. *See id.* at *8. Relying on the Law Division's decision in *Beukas v. Board of Trustees of Fairleigh Dickinson University*, the Court concluded that Plaintiffs' traditional breach-of-contract theory failed as a matter of law but that Plaintiffs could proceed under a theory

5

of quasi-contract. *See Fittipaldi*, 2021 WL 2210740, at *7-8 (citing 605 A.2d 776 (N.J. Super. Ct. Law Div. 1991), *aff'd*, 605 A.2d 708 (N.J. Super. Ct. App. Div. 1992)). To that end, the Court reasoned that under *Beukas*, New Jersey courts would apply a "good faith and fair dealing" standard to Plaintiffs' quasi-contract claim. *Id.* at *8 (citing 605 A.2d at 784-85.) Notably, the Court observed that it was not alone in applying this standard: Judge McNulty applied the same standard in a recent case. *See id.* at *9 (citing *Dougherty v. Drew Univ.*, No. 21-249, 2021 WL 1422935 (D.N.J. Apr. 14, 2021), *reconsideration denied*, 2021 WL 2310094 (June 7, 2021)).

Applying the *Beukas* standard, the Court asked whether "Plaintiffs (at a minimum) allege that Monmouth acted arbitrarily and other than in good faith by failing to reduce the cost per credit due to the remote instruction." *Id.* It concluded that Plaintiffs had. *Id.* Construing the First Amended Complaint in the light most favorable to Plaintiffs (as the Court must on a motion to dismiss), the Court reasoned that Plaintiffs' First Amended Complaint contained sufficient factual allegations to set forth a plausible quasi-contract theory. *Id.* at *9-10. As an example, the Court noted that the First Amended Complaint alleged that Monmouth reduced the cost for virtual summer 2020 courses by 15% vis-à-vis in-person courses. *Id.* at *9 (citing FAC ¶ 39). The Court further reasoned that, to the extent Monmouth invited the Court to inquire further into the factual foundations for the First Amended Complaint's allegations, that request was inappropriate at the motion-to-dismiss stage. *See id.* at *10 ("Here, the Court finds it appropriate to consider the bona fides of Monmouth's decision making and the fairness of its COVID-19 remote learning implementation upon a full factual record."). As to Plaintiffs' remaining claims for unjust enrichment, conversion, and money had and received, the Court allowed those claims to proceed for similar reasons. *See id.* at *10-11.

6

### C.     Monmouth's Motion for Reconsideration

Disagreeing with the Court's holding, Monmouth moved for reconsideration. (Def.'s Moving Br., ECF No. 39.) In its supporting brief, Monmouth asserts that the Court erred in three ways: (1) finding that Plaintiffs' First Amended Complaint adequately alleged bad faith under the *Beukas* standard; (2) disregarding cases from this District disposing of quasi-contract claims; and (3) allowing Plaintiffs' unjust enrichment, conversion, and money had and received claims to proceed. (*See id.*)

The Court summarizes Monmouth's three arguments in turn. *First*, Monmouth's Moving Brief advances that it did not "act[] in bad faith when it transitioned to remote instruction in order to comply with a government order." (*Id.* at 5-6.) *Second*, Monmouth advises that the Court overlooked two May 2021 decisions from this District: *Mitelberg v. Stevens Institute of Technology*, No. 21-1043, 2021 WL 2103265 (D.N.J. May 25, 2021), and *Kostic v. Seton Hall University*, No. 20-5566 (D.N.J. May 27, 2021), ECF No. 37. (*Id.* at 10-12.) Monmouth's Moving Brief argues that the Court should adopt the reasoning of these cases—specifically, that Monmouth's reservation-of-rights provision bars any quasi-contract claim because Monmouth reserved the right to cancel classes. (*See id.*) *Finally*, Monmouth's Moving Brief asserts that the Court should reconsider its holdings regarding Plaintiff's unjust enrichment, conversion, and money had and received claims for the same reasons above. (*See id.* at 12-13.)

## II.     LEGAL STANDARD

Reconsideration under Local Civil Rule 7.1 is "an extraordinary remedy" that is rarely granted. *Interfaith Cmty. Org v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 507 (D.N.J. 2002) (citations omitted). It requires the moving party to set forth the factual matters or controlling legal authorities it believes the Court overlooked when rendering its decision. *See* L. Civ. R. 7.1(i). To succeed on a motion for reconsideration, a movant must show at least one of three factors: "(1) an

7

intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion [at issue]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Significantly, a motion for reconsideration is not an opportunity to raise new matters or arguments that could have been raised before the court decided the original decision. *See Bowers v. NCAA*, 130 F. Supp. 2d 610, 612-13 (D.N.J. 2001). Nor is a motion for reconsideration an opportunity to "ask the court to rethink what it ha[s] already thought through." *Interfaith Cmty. Org.*, 215 F. Supp. 2d at 507 (alteration in original) (quoting *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990)). "Rather, the rule permits a reconsideration only when 'dispositive factual matters or controlling decisions of law' were presented to the court but were overlooked." *Id.* (quoting *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 337 (D.N.J. 1995)).

## III.  DISCUSSION

The Court now assesses whether to reconsider its Opinion. Before addressing Monmouth's Motion, however, the Court writes to provide additional context regarding its earlier Opinion.

*First*, this matter is before the Court on a motion to dismiss. As such, the Court will accept as true all well-pled factual allegations in the First Amended Complaint and draw all inferences in favor of Plaintiffs. The Court will dismiss only where, as a matter of law, Plaintiffs have failed to raise a plausible claim for relief. At this stage, the Court does not weigh evidence or make factual determinations about what is and is not. Rather, the Court's role is to assess the legal plausibility of the factual allegations in the complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

*Second*, this matter is not about Monmouth's decision to cancel in-person classes. Both parties correctly recognize that Monmouth had no discretion in deciding whether to close its doors, as multiple executive orders demanded that universities "cease in-person instruction." N.J. Exec. Order 104; N.J. Exec. Order 107. What this matter is about, however, is Monmouth's decision to charge the same tuition and fees following its closure. Unlike its decision to close, Monmouth's decision as to what to charge its students following the transition to remote education was within its control and discretionary. Thus, the focal point of the Court's analysis under the *Beukas* standard is whether Monmouth's decision to charge the same tuition and fees for both in-person and virtual education in the spring 2020 semester was nonarbitrary and made in good faith. Conversely, Monmouth's nondiscretionary decision to close and whether Monmouth made that decision in bad faith is irrelevant to the analysis under the *Beukas* standard.[2]

*Finally*, this matter concerns the benefits students expected to receive, in exchange for paying tuition and fees, upon enrolling in an institution of higher learning. When paying tuition and fees, students anticipate receiving certain features from their universities. For example, a prospective undergraduate student would expect to receive access to on-campus facilities, participation in on-campus extracurricular events, facetime with professors in class and office hours, and myriad other features. That's especially so when the university advertises the in-person experience. Baked into any university's tuition and fees, therefore, are the costs associated with students' expectations—such as maintenance for facilities, funding for extracurricular activities,

---

[2] Further, as the Court suggested in its Opinion, if the relevant decision were switching to virtual education, then claims under that theory would likely smack of educational malpractice and the quality of education offered. *See Fittipaldi*, 2021 WL 2210740, at *5 ("Any breach of contract claim that avoids such 'quality' assertions, however, is capable of stating a claim upon which relief can be granted.").

and salaries for professors. Indeed, if a university did not charge tuition and fees commensurate with students' expectations, students would likely not enroll at the university.

In this regard, tuition and fees are like the prices charged by manufacturers and retailers for other commodities. Take, for example, a car purchase. A car buyer expects to receive certain features with the purchase of a car: acceleration, fuel economy, interior refinements, etc. Car manufacturers thus build and advertise cars that accelerate quickly, refuel cheaply, and drive comfortably—and price those cars according to those built-in features. To that end, manufacturers price their cars according to what willing buyers would pay for the accumulation of features those buyers expect. If car buyers do not receive one of those features, they expect to pay less than comparable cars (if the car is not yet purchased) or to receive a refund for the feature not received (say, in the event of a recall for a defective part). All this to say that both buyers and sellers of cars cannot divorce the purchase price of cars from the underlying features inherent to those cars.

The Court applies a similar analytic framework to the facts of this case. When students enroll in a university, they do so by paying tuition and fees that bake in all the features they expect to receive. As relevant here, at least one of those features is a premium associated with an in-person experience. Students not receiving that in-person experience would expect to (a) pay less tuition and fees or (b) receive a refund commensurate with the cost of the in-person premium. The precise contours of what constitutes the in-person premium are not for the Court to decide at this stage. It may very well be that the in-person premium charged by Monmouth is *de minimis* or perhaps even nonexistent. It may also be that the in-person premium is accounted for entirely by fees and costs not at issue in this litigation (such as fees associated with on-campus living or Monmouth's endowment). But the Court is not now answering questions about the scope of the in-person premium, which is, in all events, best left for fact and expert discovery to solve.

Against that backdrop, the Court now addresses Monmouth's arguments for reconsideration.

### A. The Court Does Not Reconsider Its Finding that the First Amended Complaint Adequately Alleged that Monmouth Acted Arbitrarily.

Up first is Monmouth's argument that the Court failed to adequately consider the First Amended Complaint's dearth of allegations regarding Monmouth's bad faith. Before considering the substance, the Court notes that this argument could have been raised in Monmouth's original motion to dismiss and reply brief. *But see Pizarro v. Wells Fargo Bank, N.A.*, 762 F. App'x 115, 118 (3d Cir. 2019) (affirming district court's denial of reconsideration motion where movant "raised arguments that could have been raised before" and "did not provide a basis for reconsideration" (citing *Max's Seafood Café*, 176 F.3d at 677)); *Mid-American Salt, LLC v. Morris Cnty. Coop. Pricing Council*, 964 F.3d 218, 230 (3d Cir. 2020) (affirming district court's denial of reconsideration motion where movant "had ample opportunity" to assert a new claim "but decided not to"). Monmouth also fails to specify which of the three grounds this argument fits under. Because the argument appears to take issue with the Court's findings regarding application of the *Beukas* standard and findings regarding the First Amended Complaint's allegations over Monmouth's arbitrariness, the Court analyzes this argument under the third prong—the need to correct a clear error of law or fact. *Max's Seafood Café*, 176 F.3d at 677.

Under that prong, Monmouth has not met its burden to demonstrate reconsideration because it has not shown any clear error. To start, Monmouth agrees that "*Beukas* provides the proper analytical framework for assessing pandemic-related breach of contract claims against universities for failing to provide in-person instruction." (Def.'s Moving Br. 5.) As the Court stated in its Opinion, under *Beukas*, the proper inquiry is "whether the institution acted in good faith and dealt fairly with its student body," which in turn looks to "the *bona fides* of the decisionmaking

11

and the fairness of its implementation." 605 A.2d at 784. Monmouth, however, morphs the inquiry into something else: "whether the university acted in good faith when it [made a decision]." (Def.'s Moving Br. 5 (citing *Mitelberg*, 2021 WL 2103265, at *3).) That framing ignores half of the *Beukas* standard—namely, whether Monmouth dealt fairly with its students when implementing its decision to charge students the same tuition for the spring 2020 semester.

With the proper question set, the Court finds that Monmouth has not advanced clear error regarding the First Amended Complaint's allegations of unfair dealings with Monmouth's students. To the contrary, and as already found by the Court, Plaintiffs' First Amended Complaint alleges numerous facts showing that Monmouth acted in less than good faith and dealt unfairly with its students. Plaintiffs' First Amended Complaint alleges that, before the pandemic, Monmouth did not offer online undergraduate degrees and offered limited undergraduate and graduate virtual coursework. (FAC ¶¶ 36, 58.) Taking that allegation as true and taking all inferences in favor of Plaintiffs, the Court can reasonably infer that Monmouth was not prepared to offer widespread virtual courses at the onset of the pandemic and that Monmouth may have therefore thought to reduce the costs of those courses. Yet Monmouth chose to charge the same for virtual and in-person classes in the spring 2020 semester. As another example, Plaintiffs' First Amended Complaint alleges that, during the pandemic, in the summer 2020 semester, Monmouth reduced the cost for virtual courses by 15% vis-à-vis in-person courses. (*Id.* ¶ 39.) Taking that allegation as true and all inferences in favor of Plaintiffs, the Court can reasonably infer that Monmouth recognized the premium placed on in-person classes by deciding to reduce the cost for virtual courses. Yet Monmouth appears to have arbitrarily charged students the same for in-person and virtual courses in spring 2020. *Cf. Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001) ("[A] party exercising its right to use discretion in setting price under a contract breaches

the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract.").

Monmouth's counterarguments do not sway the Court. Monmouth first argues that "Plaintiffs did not allege the transition to remote instruction was made in bad faith." (Def.'s Moving Br. 5.) That argument fails, however, for the reasons above: in determining the fairness of Monmouth's conduct under the quasi-contract, the relevant decision is Monmouth's decision to charge the same rate of tuition for virtual courses not Monmouth's decision to switch to virtual education. Monmouth also argues that the summer 2020 reduction in tuition was a "subsequent remedial measure" and therefore inadmissible under Federal Rule of Evidence 407. (*Id.* at 6-8.) This argument fails because it rests on the flawed presumption that the Court is weighing evidence and making evidentiary determinations at this stage. *See Mele v. Fed. Rsrv. Bank of N.Y.*, 359 F.3d 251, 257 (3d Cir. 2004) ("It is black-letter law that [a] motion to dismiss for failure to state a claim . . . is to be evaluated only on the pleadings." (alterations in original) (quoting *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239, 266 (3d Cir. 2001))); *Ricciuiti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("The fact that a pleading contains references to documents that may eventually be ruled inadmissible in evidence is not a proper basis for dismissal pursuant to Rule 12(b)(6).").

Finally, Monmouth argues that the Court erred because it misconstrued the quasi-contract between Monmouth and its students. (Def.'s Moving Br. 8-9.) Monmouth appears to suggest that the Court based its holding on the remedy sought and not Monmouth's bad-faith or arbitrary conduct in performing the quasi-contract. (*See id.* at 8.) Not so. From what the Court can glean at this early stage, the quasi-contract at issue is an exchange of tuition payments for education. Part

13

of that education is a premium for the in-person experience that Monmouth advertised. So to fulfill its end of the bargain, Monmouth had to deliver education with an in-person experience; it could not because the State demanded that all institutions of higher education close their campuses. Instead, Monmouth delivered education without an in-person experience but, in performing its end of the quasi-contract, decided to charge students the same tuition *as if those students received the in-person experience*. Viewed in this light, Monmouth's failure to provide pro-rated tuition is simply another allegation of Monmouth's failure to perform the quasi-contract. *See Gourdine v. Felician Coll.*, 2006 WL 2346278, at *5 (N.J. Super. Ct. App. Div. Aug. 15, 2006) (per curiam) ("[W]e do not interpret *Beukas* to require financial support in exchange for ending a program. Rather, we consider that as an aspect of the manner in which the institution sought to ease the closing of the program that *must be considered in the context of whether the institution acted in good faith.*" (emphasis added)).

### B. The Court Does Not Reconsider Its Opinion Based on Non-Controlling Contrary Authority.

Monmouth next advances that the Court overlooked two factually similar cases from this District, *Mitelberg v. Stevens Institute of Technology* and *Kostic v. Seton Hall University*. Neither case, however, merits reconsideration of the Court's Opinion. Reconsideration requires controlling law, and neither case is controlling. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (citation omitted)); *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("Where a second judge believes that a different result may obtain, independent analysis is appropriate." (citation omitted)). Although this reason alone routs Monmouth's argument, the Court considers whether the substance of these two cases alters the Court's prior Opinion.

14

As Monmouth notes, both cases reason that a university's reservation-of-rights policy defeats any contract claim. In *Mitelberg*, the court found that, through its course catalog, the defendant Stevens Institute of Technology "expressly retained the right to alter requirements and procedures." 2021 WL 2103265, at *4. Specifically, the defendant's policy stated that it "reserves the right to change the information, regulations, requirements, procedures and policies announced in th[e] catalog including but not limited to: requirements for admission; graduation or degrees; scheduling; credit or content of courses; fees; and calendars." *Id.* (alteration in original) (citation omitted). Similarly, in *Kostic*, the court found that "[t]ransitioning classes to remote learning due to the COVID-19 pandemic no doubt falls within Seton Hall's authority reserved in the Course Catalogue." Slip op. at 4. As relevant there, the defendant Seton Hall University's course catalogue provided that the university "reserves the right to . . . change the time and place of any course offered" and further "reserves the right to close, cancel or modify any academic program." *Id.*[3]

The Court respectfully disagrees with its sister courts. Conclusions about whether a reservation-of-rights clause defeats a quasi-contract necessarily turn on determining the proper scope of the quasi-contract itself. The courts in *Mitelberg* and *Kostic* appear to construe the quasi-contract (and the universities' consequent obligations) as narrowly applying to courses, credits, and professors. *See Mitelberg*, 2021 WL 2103265, at *4; *Kostic*, slip op. at 4-5. Because those courts construe the quasi-contract narrowly, they construe the reservation-of-rights provisions as broadly applying to the universities' decisions to switch to virtual education. By contrast, this Court finds that questions about the proper scope of the quasi-contract and the application of Monmouth's reservation-of-rights policy are best left for discovery and summary

---

[3] The Court also notes that both cases rely heavily on Judge McNulty's decision in *Dougherty*. The Court discussed that decision at length in its Opinion; Monmouth's decision to provide additional support for that case thus does little to persuade the Court to reconsider.

15

judgment. *See, e.g.*, *Doe v. Emory Univ.*, 2021 WL 358391, at *6 (N.D. Ga. Jan. 22, 2021) ("At [the motion-to-dismiss stage], the Court merely finds that the [d]efendant's customary practice and the [p]laintiffs' payment of tuition represent sufficient factual allegations of mutual assent to an implied contract."); *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1358 (M.D. Fla. 2021) (denying motion to dismiss breach-of-contract claim where court found "[t]he on-campus experience is far from 'free'" and rejected argument that tuition payments account only for academic credits). That's so especially considering the First Amended Complaint's numerous allegations regarding Monmouth's marketing about on-campus opportunities. *Cf. Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1218 (M.D. Fla. 2020) ("These allegations are sufficient at this early stage, especially because Florida law recognizes that the college/student contract is typically implied in the [c]ollege's publications."). Indeed, should the quasi-contract encompass access to facilities, extracurricular activities, internships, and other on-campus opportunities (as alleged by Plaintiffs' First Amended Complaint), Monmouth's reservation-of-rights policy would not completely absolve Monmouth of liability. (*E.g.*, FAC ¶¶ 29, 31.) At this early stage, the Court construes the quasi-contract as alleged in the First Amended Complaint and waits for discovery to assess whether that contract ought to be curtailed.[4]

---

[4] The Court echoes the logic from a similar case pertaining to Boston University:

> Other documents unavailable to the court at the motion to dismiss stage, for example, may undercut the reasonableness of any expectation of in-person instruction. In a similar vein, review of the specific representations BU made during the billing and course registration processes (the court has not yet seen the documents relevant to these processes) may reveal that no student could have reasonably expected payment of tuition and fees and registration for classroom courses to entitle him or her to in-person instruction and access to on-campus facilities and resources.

*In re Bos. Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20, 24 n.6 (D. Mass. 2021).

16

### C. The Court Reconsiders Its Holding Regarding Conversion.

Monmouth's final argument concerns the Court's holdings on Plaintiffs' three other causes of action. Regarding Plaintiffs' unjust enrichment and money had and received claims, the Court will not reconsider its holdings for the same reasons as above. Regarding Plaintiffs' conversion claim, however, the Court finds good cause to reconsider its holding as a clear error of law. When tort claims like conversion are brought alongside contract claims, the success of the tort claim turns on "whether the tortious conduct is extrinsic to the contract between the parties." *Heyman v. Citimortgage, Inc.*, No. 14-1680, 2019 WL 2642655, at *29 (D.N.J. June 27, 2019) (citation omitted). So, to maintain a separate conversion claim, Plaintiffs must allege conduct that is "extraneous to the contract." *Id.* (quoting *Bracco Diagnostics., Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 563 (D.N.J. 2002)). Plaintiffs' First Amended Complaint fails to do so—instead it relies exclusively on the quasi-contract. (*See* FAC ¶ 112 ("Plaintiffs and members of the Class and Subclass exchanged their property (funds) in the form of tuition and mandatory fees for a full semester of in-person education, in-person services, access to facilities, and face to face instruction.").) The economic loss doctrine thus bars Plaintiffs' conversion claim. *See Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 311 (D.N.J. 2009) (applying New Jersey law) ("[T]he Court finds that [p]laintiffs' claim[] for . . . conversion [is] barred by the economic loss doctrine."); *Heyman*, 2019 WL 2642655, at *30 (listing six cases barring torts and conversion claims under economic loss doctrine).

## IV. CONCLUSION

The Court grants in-part and denies in-part Monmouth's Motion. Specifically, the Court reconsiders its holding regarding the First Amended Complaint's conversion claim and dismisses that claim without prejudice. In all other respects, the Court denies Monmouth's Motion. The Court will issue an order consistent with this Memorandum Opinion.

*[signature]*

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**